**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

EMMACULATE REFLECTIONS, LLC,
and KELLERMEYER BERGENSONS
SERVICES, LLC,

                  *Plaintiffs,*

v.

NABILA ALTMAN,

                  *Defendant*;

_____

NABILA ALTMAN,

                  *Counter-Plaintiff,*

v.

KELLERMEYER BERGENSONS
SERVICES, LLC,

                  *Counter-Defendant.*

**CASE NO.: 6:19-cv-02233**

**PLAINTIFF/COUNTER-DEFENDANT NABILA ALTMAN'S ANSWER,**
**AFFIRMATIVE DEFENSES, COUNTERCLAIMS FOR DAMAGES AND INJUNCTIVE**
**RELIEF, AND DEMAND FOR JURY TRIAL**

       Defendant/Counter-Plaintiff Nabila Altman, through her undersigned counsel, hereby files

her Answer, Affirmative Defenses, Counterclaims for Damages and Injunctive Relief, and

Demand for Jury Trial, and in support states:

## ANSWER[1]

1. Denied.

2. Admitted as to the amount in controversy and federal question jurisdiction. Defendant is without sufficient facts to admit or deny the existence of diversity jurisdiction.

3. Admitted.

4. Unknown.

5. Admitted.

6. Unknown.

7. Admitted for purposes of jurisdiction. Denied that any misappropriation of trade secrets occurred or that any trade secrets are at issue.

8. Admitted that venue is proper. Denied in all other respects.

9. Unknown.

10. Denied that Defendant began working for Plaintiffs in 2012. Admitted in all other respects.

11. Admitted that Defendant entered such an agreement with Plaintiffs and that the Employment Agreement is a true and correct copy of same. Denied that any competitive restrictions contained in the Employment Agreement are enforceable.

12. Admitted that the Employment Agreement contains the quoted language. Denied that any competitive restrictions contained in the Employment Agreement are enforceable.

13. Admitted that the Employment Agreement contains the quoted language. Denied in all other respects.

---

[1] The numbered paragraphs in the Answer correspond to the numbered allegations in Emmaculate Reflections, LLC and Kellermeyer Bergensons Services, LLC's Amended Complaint (Doc. 16). "Plaintiffs" refers to Emmaculate Reflections, LLC and Kellermeyer Bergensons Services, LLC. "Defendant" refers to Nabila Altman.

14. Denied.

15. Admitted.

16. Admitted.

17. Admitted.

18. Admitted.

19. Denied.

20. Admitted that Plaintiffs sent the referenced correspondence. Denied that Defendant is subject to any valid post-termination competitive restrictions and denied in all other respects.

21. Admitted that Defendant competed with Emmaculate in providing cleaning services. Denied specifically that any such competition was unfair or unlawful or involved any use or conversion of Plaintiffs' property. Denied in all other respects.

22. Denied.

23. Denied.

24. Denied.

25. Defendant repeats and realleges her response to paragraphs 1 through 24 as if fully set forth herein.

26. Admitted that Plaintiffs' Amended Complaint contains a Count for breach of contract. Denied that Defendant breached any legally enforceable contract with Plaintiffs.

27. Denied.

28. Denied.

29. Denied.

30. Denied.

31. Defendant repeats and realleges her response to paragraphs 1 through 24 as if fully set forth herein.

32. Admitted that Plaintiffs' Amended Complaint contains a Count for breach of contract. Denied that Defendant breached any legally enforceable contract with Plaintiffs.

33. Denied.

34. Denied.

35. Denied.

36. Defendant repeats and realleges her response to paragraphs 1 through 24 as if fully set forth herein.

37. Admitted that Plaintiffs' Amended Complaint contains a Count for misappropriation of trade secrets and seeks injunctive relief. Denied that Defendant misappropriated any trade secrets or that any trade secrets are at issue in this lawsuit or that Plaintiffs' are entitled to injunctive relief.

38. Denied.

39. Denied.

40. Denied.

41. Admitted that Defendant was aware of her valid, enforceable contractual duties as part of her employment relationship with Plaintiffs. Denied that Defendant misappropriated or used any of Plaintiffs' information or property. Denied that there are any trade secrets at issue in this case. Denied in all other respects.

42. Denied.

43. Denied.

44. Denied.

45. Denied.

46. Denied.

47. Denied.

48. Denied.

49. Defendant repeats and realleges her response to paragraphs 1 through 24 as if fully set forth herein.

50. Admitted that Plaintiffs' Amended Complaint contains a Count for misappropriation of trade secrets and seeks injunctive relief. Denied that Defendant misappropriated any trade secrets or that any trade secrets are at issue in this lawsuit.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

58. Denied.

59. Defendant repeats and realleges her response to paragraphs 1 through 24 as if fully set forth herein.

60. Admitted that Plantiffs bring a count for tortious interference. Denied that any such tortious interference occurred and denied in all other respects.

61. Denied.

62. Denied.

63. Denied.

64. Denied.

65. Admitted that Plaintiffs seek injunctive relief. Denied in all other respects.

66. Defendant repeats and realleges her response to paragraphs 1 through 24 as if fully set forth herein.

67. Denied.

68. Denied.

69. Denied.

70. Denied.

71. Denied.

72. Denied.

73. Denied.

74. Denied.

75. Denied.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

80. Denied.

81. Denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by the affirmative defense of illegality. The restrictive covenants at issue constitute unlawful restraints on trade in that they lack a legitimate business interest to support them. Plaintiffs do not have a legitimate business interest because (1) there is no confidential or proprietary information at issue that is valuable and unique to Plaintiffs; (2) Plaintiffs did not provide extraordinary or specialized training to Defendant; and (3) there are no substantial, legally protectable relationships at issue. Because there is no legitimate business interest, the restrictive covenants at issue serve no purpose other than to prohibit competition *per se* and are therefore illegal and unenforceable.

### Second Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by the affirmative defense of prior material breach. As part of her employment, Plaintiffs agreed to pay Defendant certain commissions based on the client accounts that she generated. Plaintiffs routinely failed to pay Defendant her commission owed and diverted her earned commission to other employees. Plaintiffs therefore materially breached the Employment Agreement before Defendant allegedly breached any restrictive covenants. As a result, Plaintiffs' claims are barred by prior breach.

### Third Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by the affirmative defense of unclean hands. Defendant separated from Plaintiffs' employ following a litany of misconduct, including failure to pay Defendant commissions due; harassing Defendant based on her gender and status as an immigrant; and coercing Defendant to turnover her personal property (e.g. LinkedIn account) to the Plaintiffs. Subsequent to Defendant's separation from the Company, Plaintiffs continued

their campaign of harassment by stalking Defendant and engaging in a concerted smear campaign against her designed to destroy her reputation. As such, Plaintiffs come to this Court with unclean hands.

WHEREFORE, Defendant Altman respectfully requests the Court enter judgment in her favor including an award of attorney's fees and costs incurred in connection with this action and any such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Defendant Altman demands a jury trial on all issues that are triable to a jury.

## COUNTERCLAIMS FOR DAMAGES
## AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

Defendant/Counter-Plaintiff Nabila Altman ("Ms. Altman"), through undersigned counsel, files these Counterclaims against Kellermeyer Bergensons Services, LLC ("KBS") and states:

## INTRODUCTION

1. This case presents a textbook example of abusive non-compete and trade secret litigation. This anticompetitive business practice is now rampant throughout the United States and is particularly acute in Florida.

2. Ms. Altman supervised cleaning crews that cleaned restaurants. When necessary, she cleaned these restaurants herself using her own two hands.

3. The very nature of the industry and the work belies the existence of any legitimate business interest or trade secrets.

4. The customers at issue are all public. The identity of the Cheesecake Factory or its general manager's contact information is neither confidential nor a trade secret.

5. The relationships between cleaning companies and their restaurant clients are not unique, exclusive, substantial, or legally protectable under Florida law.

6.      When Ms. Altman's KBS employment ended, she sought to establish her own commercial cleaning service.

7.      Ms. Altman did so fairly, and without utilizing any of KBS's information whatsoever – let alone information that could be considered proprietary or a trade secret – and without infringing upon any legally protectable (e.g. substantial) customer relationships.

8.      Ms. Altman established her own company using only publicly available information that anyone with access to Google can obtain.

9.      In response, KBS launched a smear campaign designed to destroy Ms. Altman's reputation, a reputation that she built through decades of hard-work and outstanding customer service.

10.     KBS's goal is obvious: To prevent restaurants from doing business with Ms. Altman and to eliminate fair, ordinary, lawful competition.

11.     This is an action for a declaratory judgment holding the at issue restrictive covenants illegal under Florida Statutes § 542.335, false advertising in violation of the Lanham Act under 5 U.S.C. § 1125, defamation, tortious interference, and breach of contract.

## **PARTIES**

12.     Ms. Altman is a citizen of Lake County, Florida.

13.      KBS is limited liability company organized under Delaware law with its principal place of business in Oceanside, California. The citizenship of its members is unknown.

14.     Ms. Altman's initial employer, Emmaculate Reflections, LLC ("Emmaculate") merged with KBS, leaving KBS as the only surviving legal entity.[2]

---

[2] Per the Amended Complaint, the company known as Emmaculate Reflections, LLC no longer exists.

15.     Whatever relationship may exist between KBS and the entity formerly known as Emmaculate is a matter of their own internal concern. As pertains to Ms. Altman and the public at large, KBS is the only existing corporate entity at issue, the only Counter-Defendant, and the only legal entity responsible for the wrongful conduct alleged herein.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 for claims arising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

17.     This Court has supplemental jurisdiction over Ms. Altman's state law claims pursuant to 28 U.S.C. § 1367.  Ms. Altman's state law claims are so closely related to Ms. Altman's claims under the Lanham Act that they form part of the same case or controversy under Article III of the United States Constitution.

18.     This Court has personal jurisdiction over KBS because KBS continuously conducts business within this District.

19.     Venue is proper in this District, pursuant to 28 U.S.C. §1 391, because KBS is subject to personal jurisdiction in this District and because the acts complained of giving rise to the claims herein occurred in this District.

## GENERAL ALLEGATIONS

20.     Ms. Altman earned a bachelor's degree in housekeeping management from Hotel Einhorn in Munich, Germany in 1992.

21.     Ms. Altman came to the United States in 1996 in search of a better life.

22.     She speaks English, Spanish, Arabic, and Portuguese.

23.     When she arrived in the United States, she did not speak English. While living in Chicago, she walked miles to and from school each day to study and learn English.

24.     Prior to working for Emmaculate, Ms. Altman worked in hospitality operations at Disney World.

25.     Ms. Altman's job at Emmaculate, and eventually KBS, consisted of the following responsibilities:

a.  Identifying new commercial establishment clients. These clients are primarily restaurants but also include hotels. Ms. Altman was expected to identify such clients and prospective clients through her own independent efforts and using publicly available resources (e.g. LinkedIn, Google, etc.).

b.  Pitching potential clients provided to her by Emmaculate and eventually KBS. These potential clients were targeted by Emmaculate and eventually KBS through telemarketers that it employs cold call restaurants and hotels soliciting their cleaning business.

c.  Meeting with potential commercial clients (e.g. restaurants) to look at their space and figure out a price quote.

d.  Creating her own price quotes, bids, and/or proposals based on her industry knowledge and experience and not based on any secret formula.

e.  Ensuring a high level of customer satisfaction by doing anything reasonably necessary to meet client expectations.

26.     Ms. Altman originally started as a supervisor and eventually worked her way up to hold various roles in operations and sales.

27.     Throughout her time at Emmaculate and KBS, Ms. Altman routinely worked more than fifteen-hours a day.

28.     Ms. Altman routinely traveled between Orlando, Tampa, and Sarasota, often multiple times a week, to check on clients and fix operational problems.

29.     Ms. Altman answered her phone at any hour of the day or night.

30.     Over time, because of her work ethic and her ability to always deliver results, Ms. Altman was assigned an ever-growing set of responsibilities.

31.     Eventually, Ms. Altman's duties expanded to include operations in Massachusetts and North Carolina.

32.     When her duties expanded to include North Carolina, Ms. Altman drove there, sometimes sleeping in her car on the side of the road. She did this because she loved her job and was proud of her work.

*Fighting for Her Commissions*

33.     At the same time that Ms. Altman was routinely working more than 100 hours a week to sell new accounts, maintain existing accounts, and supervise operations throughout Florida and beyond, she was constantly fighting for her paycheck.

34.     By Agreement between Emmaculate and Ms. Altman, Ms. Altman was entitled to the following commission on all accounts she generated: 50% of the first month's revenue and 10% of all monthly revenue thereafter.

35.     Invariably, on payday, Emmaculate, and eventually KBS, would not pay Ms. Altman the agreed upon commission.

36.     For instance, in May 2019, Ms. Altman emailed her supervisors about commission missing from her paycheck. After discussion, KBS admitted that her commission for the month was short by $3,000.

37.     This sort of situation was a routine occurrence. Ms. Altman kept impeccable records regarding her commissions owed, and often spent several hours each month calculating those commissions and begging KBS to be paid what she earned.

38.     In addition to miscalculating or withholding her commissions, Emmaculate and then KBS unilaterally changed her commission structure, forcing Ms. Altman to split various commissions with other employees. The Parties never previously agreed to such a split. In many instances, Ms. Altman's commissions were diverted to pay family members of Emmaculate and KBS leadership.

*Ms. Altman's Separation from KBS*

39.     The relationship between Ms. Altman and KBS reached a breaking point in May 2019.

40.     In sales meetings, Bob Dimaio mocked Ms. Altman's immigrant status, saying that she came to this country in a "banana boat."

41.     Ira Altman (no relation) mocked her abilities, claiming that her husband must be doing her work for her because there is no way that a woman could do as much as she does and meet such sales quotas.

42.     Ira Altman and Leonard Feinstein demanded Ms. Altman give KBS the password to her personal LinkedIn account and allow KBS to take control of her LinkedIn account as "company property." Ms. Altman started the account when she was not working at KBS, paid for it herself, and it was never considered or intended to be corporate property.

43.     This harassment, coupled with the 100+ hour weeks, constantly being on call, and constantly pleading with her bosses to be paid her commission, ultimately took its toll. Ms. Altman began having panic attacks.

44.     Ms. Altman tendered her resignation on May 26, 2019. In her last two weeks with KBS, Ms. Altman worked as hard as she always did.

45.     During her time at KBS, Ms. Altman had a 98% client retention rate. Although eligible for an annual retention bonus, and although other employees received an annual retention bonus, Ms. Altman has not received any such bonus since 2013.

*Events Following Separation from KBS*

46.     Upon providing her two weeks' notice, Ms. Altman created her own company called MCN Cleaning, LLC ("MCN"), with the intention of establishing her own business after separating from KBS.

47.     Through MCN, Ms. Altman performed services for a single, small client after she left KBS. After observing that she was being followed everywhere by KBS employees and what appeared to be a private investigator, Ms. Altman canceled the account and shut down MCN.

48.     On July 31, 2019, Ms. Altman learned that KBS had created a LinkedIn profile in her name, linked to her former email account at the Emmaculate email domain.

49.     At the same time, KBS launched an aggressive campaign to destroy Ms. Altman's reputation with her former colleagues and customers.

50.     KBS made the following false statements to Ms. Altman's former colleagues and clients:

   a.   That Ms. Altman had stolen KBS's trade secrets and that customers should not do business with her because they would become implicated in the lawsuit. This representation was made to the Renaissance Hotel and others.

   b.   That KBS had fired Ms. Altman for stealing the its trade secrets. This representation was made to the Cheesecake Factory, Legoland, and others.

c.   That KBS had fired Ms. Altman for stealing its equipment, and specifically floor machines. This representation was made to the Legoland Hotel and others.

51.   KBS went so far as to dispatch one of its managers, Mike Acosta, to visit customers in person and advise them that Ms. Altman had been fired for theft of trade secrets and Company property and that customers should avoid doing business with her.

52.   But that was not enough. KBS instructed multiple employees to stalk Ms. Altman, take pictures and video of her whereabouts, and report back to corporate if she was seen in the vicinity of any of the restaurants they serviced.

53.   As a result of KBS's conduct, Ms. Altman has been forced to close her competing business.

*The So-Called Trade Secrets*

54.   KBS solicits business from commercial establishments, primarily restaurants, but also hotels and country clubs.

55.   The Emmaculate website, controlled and operated by KBS, prominently lists several clients, including The Cheesecake Factory, Ruth's Chris, Margaritaville, Morton's, Renaissance Hotels, and others.

56.   The identities of any and all clients and potential clients at issue are neither confidential nor a trade secret.

57.   Ms. Altman obtained new business through her own prospecting via Google and LinkedIn.

58.   KBS obtained and obtains new business through telemarketers and cold-calling.

59.   The contact information for the at issue clients and potential clients is neither confidential nor a trade secret.

60.     Anybody willing to work hard can start a commercial cleaning business and compete to win business from restaurants and hotels.

61.     The act of cleaning a restaurant does not involve any proprietary methods, systems, or techniques.

62.     Restaurants and hotels routinely receive bids, proposals, and solicitations from commercial cleaning companies interested in earning their business.

63.     During her time in this industry, Ms. Altman has quoted prices based on her own inspection of the restaurant at issue and her general knowledge of the industry.

64.     Ms. Altman has never utilized any exact formula, let alone any formula created by Emmaculate/KBS.

65.     Ms. Altman never misappropriated any of KBS/Emmaculate's information or property.

66.     There are no trade secrets at issue in this dispute.

## COUNT I
## DECLARATORY JUDGMENT

67.     Ms. Altman repeats and realleges Paragraphs 1-66 as if fully set forth herein.

68.     KBS maintains that Ms. Altman is subject to enforceable non-compete and non-solicitation restrictions.

69.     A dispute exists between KBS and Ms. Altman regarding enforceability of the at-issue restrictive covenants.

70.     There exists an actual controversy that flows from KBS's assertion that Ms. Altman is bound by the restrictive covenants such that her fair competition is prohibited.

71.     Both Parties' legal rights, powers, and duties depend upon a declaration by this Court.

72.     All parties with any interest in the declaration sought are before this Court and will have an opportunity to respond.

73.     Neither the controversy nor the facts upon which it is based are hypothetical. The Parties have a concrete controversy that is susceptible to conclusive judicial determination given that a declaration regarding the enforceability of the restrictive covenants would immediately clarify the Parties' respective rights, powers, and duties.

74.     The restrictive covenants at issue constitute unlawful restraints of trade under Florida Statute section 542.335, as they are neither supported by nor necessary to protect any legitimate business interests. Specifically:

    a.  Ms. Altman did not receive any specialized or extraordinary training from KBS;

    b.  Ms. Altman did not have access to and was not exposed to any confidential business information that was unique to KBS and that could be used to engage in unfair competition;

    c.  No customer relationships potentially at issue are substantial or protectable within the meaning of Florida Statutes section 542.335; and

    d.  There are no other legitimate business interests that could justify enforcement of the at-issue restrictive covenants.

75.     The restrictive covenants merely serve to prevent competition per se, rendering them violative of Florida Statutes section 542.335 and unenforceable as a matter of law.

76.     Accordingly, Ms. Altman seeks a declaration that the restrictive covenants at issue are unenforceable under Florida law.

## COUNT II
## FALSE ADVERTISING UNDER 15 U.S.C. § 1125(a)

77.     Ms. Altman repeats and realleges Paragraphs 1-66 as if fully set forth herein.

78.     Ms. Altman competed against KBS in the provision of commercial cleaning services until forced to shutter her business. Upon resolution of this litigation, Ms. Altman intends to again engage in this same line of business.

79.     Ms. Altman has a commercial interest in her industry and business reputation within the commercial and restaurant cleaning industry.

80.     Ms. Altman has established a business reputation of honesty, reliability, hard work, and integrity in this industry.

81.     KBS knowingly made false and misleading statements in commercial advertising and promotions that misrepresent and disparage the nature, characteristics, and qualities of Plaintiff's commercial activities, services, and reputation.

82.     KBS falsely and misleadingly represented to Ms. Altman's clients and potential clients that Ms. Altman had stolen their trade secrets and been fired for stealing trade secrets and corporate property.

83.     KBS made such false and misleading representations verbally and in writing; in each instance, the representations were made directly to Ms. Altman's former and potential clients.

84.     KBS's representations were sufficiently disseminated to former and potential clients throughout the relevant market so as to constitute advertising.

85.     KBS made these representations in commerce and for commercial purposes. Specifically, KBS made these representations to destroy Ms. Altman's commercial reputation, prevent clients from doing business with her, and retain client accounts.

86.     Simultaneously, KBS established a fake LinkedIn profile for similarly improper and commercial purposes: To leverage Ms. Altman's commercial reputation and retain client accounts.

87.     KBS's false and misleading representations have misled, confused, and deceived former and prospective clients as to Ms. Altman's industry reputation. Further, these misrepresentations have the capacity to continue misleading, confusing, and deceiving Ms. Altman's former and prospective clients.

88.     These misrepresentations had and continue to have a material effect on clients' willingness to do business with Ms. Altman.

89.     Ms. Altman's injuries fall within the zone of interest protected by the Lanham Act because KBS's false advertising and disparaging misrepresentations have caused Ms. Altman to suffer a loss of goodwill, a loss of income, and damage to her industry and business reputation.

90.     KBS's remarks were widely disseminated to Ms. Altman's former and prospective clients. These false and misleading remarks were sufficiently disseminated so as to constitute advertising or promotion within the commercial cleaning industry.

91.     KBS made these false and misleading representations in interstate commerce and these false and misleading representations affect interstate commerce.

92.     KBS directed its false advertisements and disparaging misrepresentations to clients and potential clients throughout the industry to manipulate them into doing business with KBS and not doing business with Ms. Altman.

93.     Ms. Altman's economic and reputational injuries were directly caused by KBS's false and misleading representations. As a direct and proximate result of KBS's false advertisements, Ms. Altman has suffered, and will continue to suffer, irreparable injury which

cannot be measured solely in terms of monetary damages and for which Ms. Altman has no adequate remedy at law.

94.     Additionally, as a result of KBS's false and misleading representations, Ms. Altman is entitled to actual consequential damages resulting from Defendant's conduct in an amount to be determined at trial.

95.     Ms. Altman is also entitled to corrective advertising and injunctive relief.

## COUNT III
## DEFAMATION *PER SE*

96.     Ms. Altman repeats and realleges Paragraphs 1-66 as if fully set forth herein.

97.     KBS made the following statements to Ms. Altman's former colleagues, former clients, and prospective clients:

    a.    That Ms. Altman had stolen KBS's trade secrets and that customers should not do business with her because they would become implicated in the lawsuit. This representation was made to the Renaissance Hotel and others.

    b.    That KBS had fired Ms. Altman for stealing the Company's trade secrets. This representation was made to the Cheesecake Factory, Legoland, and others.

    c.    That KBS had fired Ms. Altman for stealing Company equipment, and specifically floor machines. This representation was made to the Legoland Hotel and others.

98.     KBS's statements are defamatory per se because, even when considered alone, they tend to subject Ms. Altman to distrust, ridicule, contempt, and disgrace and are injurious to Ms. Altman's professional reputation. Further, considered alone, they impute to Ms. Altman criminal offenses and conduct and characteristics that are incompatible with the proper exercise of her lawful profession or office.

99.     These statements were aimed at harming Ms. Altman's fitness in her profession and her moral character.

100.     At the time it made these statements, KBS knew or should have known that the statements would cause severe damage to her personal and professional reputation, her business opportunities, her career, and ultimately her ability to earn a living.

101.     KBS made the foregoing statements with actual malice because it either knew of their falsity or made the statements with reckless disregard for their truth or falsity.

102.     KBS knew that these statements were false when publishing them or, at minimum, had no reason to believe that they were true upon publication, thereby destroying any privilege on which KBS could rely.

103.     In making the defamatory statements, KBS acted intentionally, maliciously, willfully, and with the intent to injure Ms. Altman.

104.     Ms. Altman has been harmed by the diminished economic value of (1) the goodwill she built over her many years in the relevant marketplace and (2) her reputation as an honest, ethical, reliable, hard-working woman, which she built over many years.

105.     KBS's statements wrongfully paint Ms. Altman as unprofessional, untrustworthy, immoral, criminal, and unfit for employment in the relevant industry.

106.     KBS's conduct was unreasonable and outrageous, exceeds the bounds tolerated by decent society, and was done willfully, maliciously, and deliberately to cause Ms. Altman severe mental and emotional pain, distress, anguish, and the loss of enjoyment of life, so as to justify the award of punitive and exemplary damages.

107.     As a result of KBS's defamatory statements, Ms. Altman has been damaged in an amount to be determined at trial.

## COUNT IV
## <u>TORTIOUS INTERFERENCE</u>

108.    Ms. Altman repeats and realleges Paragraphs 1-66 as if fully set forth herein.

109.    Ms. Altman has business relationships with dozens of commercial establishments, particularly restaurants, hotels, and country clubs.

110.    KBS is and was aware of Ms. Altman's business relationships with these commercial establishments.

111.    With that knowledge, KBS intentionally and unjustifiably interfered with and continues to intentionally and unjustifiably interfere with Ms. Altman's advantageous business relationship with, at a minimum, The Cheesecake Factory, Renaissance Hotels, and Legoland.

112.    KBS interfered with Ms. Altman's business relationship with these specific entities by, at a minimum, falsely advising these entities that Ms. Altman had been fired from the company for theft of trade secrets and corporate property.

113.    As a direct and proximate result of Defendant's tortious interference with Ms. Altman's business relationships, Ms. Altman as suffered actual and consequential damages in an amount to be determined at trial.

## COUNT V
## <u>BREACH OF CONTRACT</u>

114.    Ms. Altman repeats and realleges Paragraphs 1-45 as if fully set forth herein.

115.    The February 28, 2018 offer letter from Emmaculate to Ms. Altman constitutes a contract.

116.    The operative contract provides that the company would pay Ms. Altman her commissions based on "the same commission plans that were maintained by the Business as of February 28, 2018."

117.    As of that date, the commission structure provided that Ms. Altman was entitled to the following commission on all accounts she generated: 50% of the first month's revenue and 10% of all monthly revenue thereafter.

118.    As a result of the merger, KBS assumed liability and responsibility for satisfying these contractual obligations.

119.    KBS has failed to pay Ms. Altman her commission earned and due under the Parties' agreement. In particular, KBS has unilaterally reduced Ms. Altman's commission percentage on her accounts and diverted her earned commissions to other employees.

120.    KBS's conduct constitutes a breach of the operative agreement.

121.    As a result of KBS's conduct, Ms. Altman has been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

Ms. Altman requests the Court enter judgment in her favor as follows:

a.  Declaratory judgment that any restrictive covenants at issue are unenforceable as to her;

b.  Compensatory damages arising from KBS's false advertising to the fullest extent permitted by law;

c.  Disgorgement of profits earned by KBS as a result of their false advertising to the fullest extent permitted by law;

d.  Corrective advertising to remedy KBS's false advertising;

e.  Compensatory damages flowing from KBS's defamation to the fullest extent permitted by law;

f.   Presumed damages flowing from KBS's defamation to the fullest extent permitted by law;

g.   Punitive damages to punish KBS's defamation to the fullest extent permitted by law;

h.   Compensatory damages flowing from KBS's tortious interference to the fullest extent permitted by law;

i.   Punitive damages flowing from KBS's tortious interference to the fullest extent permitted by law;

j.   Compensatory damages flowing from KBS's breach of contract to the fullest extent permitted by law;

k.   An award of costs and reasonable attorneys' fees;

l.   Pre-judgment and post judgment interest;

m.   Final judgment on all counts in an amount of no less than $10,000,000; and

n.   Such other relief this Court deems just and proper.

## JURY TRIAL DEMAND

Ms. Altman demands a jury trial on all issues that are triable to a jury.

Dated: January 31, 2020                           Respectfully submitted,

                                                  By: s/ *Jonathan Pollard*

                                                  Jonathan E. Pollard
                                                  Florida Bar No.: 83613
                                                  jpollard@pollardllc.com
                                                  **Trial Counsel**

                                                  Christopher S. Prater
                                                  Florida Bar No.: 105488
                                                  cprater@pollardllc.com

                                                  Pollard PLLC
                                                  100 SE 3rd Ave., Ste. 601
                                                  Fort Lauderdale, FL 33394

Telephone: (954) 332-2380
*Attorneys for Defendant/Counter-*
*Plaintiff Nabila Altman*

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2020 this document was electronically served on all

counsel of record via the Court's electronic case filing system.

s/ *Jonathan Pollard*